UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:18CR-89 |
| Plaintiff, | JUDGE J. BARRETT |
| vs. | INDICTMENT |
| RAKESH SHARMA, and MIKE JONES, | 18 U.S.C. § 2<br>18 U.S.C. § 1347<br>18 U.S.C. § 1349 |
| Defendants. | NOTICE OF FORFEITURE |

**THE GRAND JURY CHARGES THAT:**

At all times relevant to this Indictment:

**INTRODUCTION**

1. Defendant **RAKESH SHARMA** (hereafter "**SHARMA**") was licensed as a medical doctor in the State of Ohio. On or about August 2001, defendant **SHARMA** incorporated Lindenwald Medical Associates, Inc. (hereafter "LMA"). **SHARMA** owned and operated LMA for the purpose of providing medical services. As the owner and operator of LMA, **SHARMA** employed Defendant **MIKE JONES** (hereafter "**JONES**") and others known and unknown to the Grand Jury to work at LMA. On or about 2009, **SHARMA** moved to Florida. **SHARMA** later sold LMA, on or about January 2014.

2. Defendant **JONES** was licensed as a Nurse Practitioner. **JONES** worked at LMA from on or about May 2010 through on or about June 2013.

3. LMA was located at 3570 Pleasant Avenue, Hamilton, Ohio within the Southern

1

District of Ohio.

4. LMA billed through the individual providers employed. Defendants **SHARMA**, **JONES**, and other co-conspirators, both known and unknown to the Grand Jury, obtained Medicare provider agreements, as well as Medicaid provider agreements. As part of signing the provider agreements, defendants **SHARMA** and **JONES** agreed to comply with all federal and state laws and regulations.

## HEALTH CARE BENEFIT PROGRAMS

The Medicare Program

5. Medicare was a federal health program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare are referred to as Medicare "beneficiaries."

6. Medicare was a "health care benefit program" as defined by 18 U.S.C. §24(b). In the Medicare program, participating providers agreed to bill only for services the provider actually rendered, that were medically necessary to diagnose and treat illness or injury and met the requisite criteria, and for which the provider maintained adequate supporting documentation.

The Medicaid Program

7. Medicaid, established by Congress in 1965, provided medical insurance coverage for individuals whose incomes are too low to meet the costs of necessary medical services. Approximately 60% of the funding for Ohio's Medicaid program came from the federal government. The Ohio Department of Medicaid (ODM), Columbus, Ohio, managed the Medicaid program, which was previously managed by the Ohio Department of Job and Family

Services (ODJFS). ODM, formerly ODJFS, received, reviewed, and obtained formal authority to make payment of Medicaid claims submitted to it by providers of health care.

8. Medicaid was a "health care benefit program" as defined by 18 U.S.C. §24(b).

9. If approved by ODM, formerly ODJFS for payment, the Office of Budget and Management (OBM) issues check or electronic fund transfer (EFT) from 30 East Broad Street, Columbus, Ohio 43215. Each qualified Medicaid patient received a recipient identification number to identify the patient as an authorized recipient of Medicaid benefits. Pursuant to the rules and regulations of the Ohio Medicaid Program, including Medicaid managed care organizations (MCOs), Medicaid only paid for services that were actually performed by qualified individuals and medically necessary for the patient's health.

10. In addition, Medicaid provider agreements stated that "payment" constitutes payment in full for any covered services and a covered provider agreed not to charge the member or ODM (Medicaid) any co-payment, cost sharing, down payment, or similar charge, refundable or otherwise.

CPT/HCPCS Coding

11. Medical providers and health care benefit programs used well-known and standard insurance processing codes to identify certain medical diagnoses and medical treatments and procedures. The American Medical Association assigned and published five-digit codes, known as the Current Procedural Terminology (CPT) and Healthcare Common Procedure Coding System (HCPCS) codes. Medical providers recorded diagnoses and medical procedures on a standard claim form known in the industry as the CMS 1500 form, which was then sent to the patient's health care benefit program. CPT codes needed to be designated on the CMS 1500 claim form by the health care provider and then submitted either by mail or

electronically to the health care benefit program for payment.

12. Specific CPT codes were assigned for evaluation and management (E/M) services provided to established patients in a physician's office (some of the E/M services were known as "office visits"). Among these E/M services were office visits billed under CPT codes "99211," "99212," "99213," "99214," and "99215." Insurance companies reimbursed health care providers at increasing rates based upon the level of complexity indicated by the office visit codes. For example, CPT code 99214 was used for office visits for E/M of an established patient, which required the physician to perform at least two of the following three components: a detailed history; a detailed examination; and/or a moderately complex medical decision-making. CPT 99214 was defined as the patient usually presenting problems of moderate to high severity and typically the physician spent twenty-five (25) minutes face-to-face with the patient. The procedures and services represented by CPT codes were health care benefits, items, and services, within the meaning of Title 18, Section 24(b), United States Code.

## COUNT 1
### (Conspiracy to Commit Health Care Fraud)

13. Paragraphs 1 through 12 of the Indictment are re-alleged and incorporated into Count 1 of this Indictment.

14. On or about January 3, 2006, to on or about August 29, 2014, within the Southern District of Ohio and elsewhere, defendants **RAKESH SHARMA, MIKE JONES**, and others both known and unknown to the Grand Jury, knowingly and willfully combined, conspired, and agreed with others, both known and unknown to the Grand Jury, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program, as defined by Title 18, United States Code, 24(b), and to obtain by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control

of said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## PURPOSE OF THE CONSPIRACY

15. It was the purpose of the conspiracy for defendants **SHARMA**, **JONES**, and others known and unknown to the Grand Jury, to unlawfully enrich themselves by submitting false and fraudulent claims to health care benefit programs using billing codes that reflected services that were more costly than the services actually performed.

## MANNER AND MEANS

The manner and means by which the defendants sought to accomplish the purpose of the conspiracy, including the following:

16. It was part of the conspiracy that LMA, by and through defendants **JONES,** and other co-conspirators, both known and unknown to the Grand Jury, would "examine" approximately forty (40) to sixty (60) patients per day. **SHARMA** rarely saw patients at LMA, since he primarily lived in Florida.

17. It was part of the conspiracy that defendant **SHARMA** directed LMA employees to get in as many patients in a day as they could. Defendants **SHARMA**, **JONES**, and others known and unknown to the Grand Jury, would try to get many patients in and out of the office as quick as possible. In fact, **JONES** and other co-conspirators, both known and unknown to the Grand Jury were incentivized to see as many patients as possible, as they were promised bonuses based on the receivables collected by the office.

18. It was part of the conspiracy that, many LMA patients would receive, at most, a cursory examination to determine the extent of the pain being suffered by the patients.

19. It was part of the conspiracy that **SHARMA** used urine screens to increase profits

5

at LMA. For example, **SHARMA** directed LMA employees to ensure drug screens were consistently run during the day. Employees were directed to give every patient a urine screen regardless of the medical necessity for the screen. In fact, practitioners often failed to review the results, as patients' drug screens were often negative for the drugs prescribed, indicating that the patient was likely diverting the drug, yet the practitioners still prescribed the patient controlled substances.

20. It was part of the conspiracy that **SHARMA** also used urine screens to increase profits by directing LMA employees to bill for multiple units of the urine screens when only one unit should have been billed. **SHARMA** also directed LMA employees to alter dates in order to get claims for urine screens approved.

21. It was part of the conspiracy that **SHARMA** directed LMA employees to order diagnostic tests, including genetic tests regardless of medical necessity. The LMA clinicians that ordered these genetic tests, including **SHARMA, JONES**, and other co-conspirators, both known and unknown to the Grand Jury, were provided kickback payments through the labs that processed the tests.

22. It was part of the conspiracy that, despite the cursory examination, many LMA patients would walk out of the office with a prescription for a controlled substance.

23. It was part of the conspiracy that as part of the LMA practice, defendants **SHARMA, JONES**, and others known and unknown to the Grand Jury, submitted billings to Medicare, Medicaid, and Medicaid MCOs for procedures purportedly performed. Defendants **SHARMA, JONES**, and others known and unknown to the Grand Jury, selected the billing code for each patient. **LMA's** staff, at the direction of **SHARMA**, then submitted that billing code to insurance plans on defendants **SHARMA's, JONES's**, and others' known and unknown to the

6

Grand Jury, behalf.

24. It was part of the conspiracy, that at defendant **SHARMA's** direction, LMA billed insurance plans for higher billing codes than the services actually performed by doctors. **SHARMA** specifically directed LMA employees to bill for higher codes. At **SHARMA's** direction, defendants **JONES**, and others known and unknown to the Grand Jury, also billed or caused to be billed higher CPT codes than reflected the actual time and complexity of the office visit conducted.

25. It was part of the conspiracy, that defendants **SHARMA, JONES**, and others known and unknown to the Grand Jury, often used the same billing code for their customers regardless of the service performed during the patient's appointment. Defendants **SHARMA, JONES**, and others known and unknown to the Grand Jury, used codes that reflected a service that was more costly than that which was actually performed. Defendants **SHARMA, JONES**, and others known and unknown to the Grand Jury, then received payment from the customers' insurance companies based on the submission of claims with these fraudulent billing codes. Defendants **SHARMA, JONES**, and others known and unknown to the Grand Jury, routinely billed or caused bills to be submitted to insurance providers for an office visit with CPT code 99214 and rarely billed the lower evaluation codes of 99211-99213.

26. It was part of the conspiracy that defendants **SHARMA, JONES**, and others known and unknown to the Grand Jury, would accept insurance payments from healthcare insurance for examinations that were not medically appropriate or sufficient for the billing codes that were submitted, which resulted in a loss to Medicare and Medicaid in an amount over $400,000.

**In violation of Title 18, United States Code, Section 1349.**

## COUNTS 2-4
**(Health Care Fraud)**

27. Paragraphs 1 through 26 are realleged and incorporated by reference as though fully set forth herein.

### The Scheme to Defraud

28. From in or about January 3, 2006, to in or about August 29, 2014, in the Southern District of Ohio and elsewhere, defendants **SHARMA** and **JONES**, with others known and unknown to the Grand Jury, through LMA, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, as defined in Title 18, United States Code, Section 24(b), and to obtain by means of false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services.

### The Execution of the Scheme

29. On or about the dates listed below, in the Southern District of Ohio and elsewhere, defendants **SHARMA** and **JONES**, with others known and unknown to the Grand Jury, through LMA, knowingly and willfully executed and attempted to execute the above-described scheme and artifice to defraud a health care benefit program, as defined in Title 18, United States Code, Section 24(b), including Medicare, Medicaid and Medicaid MCOs, and to obtain, by means of the false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, by causing submission to said health care benefit programs of materially false and fraudulent claims by using billing codes that reflected services that were more costly than the services actually

performed as set forth below:

| Count | Defendant | Date of Service | Date Claim Paid | CPT Code Billed | Actual CPT Code | Amount Billed | Amount Paid | Loss to Health Care Program | Health Care Benefit Program/ Beneficiary |
|---|---|---|---|---|---|---|---|---|---|
| 2 | MIKE JONES | 5/10/2013 | 6/29/2013 | 99215 | 99212 | $150 | $82.99 | $56.91 | Medicaid/L.L. |
| 3 | RAKESH SHARMA | 8/6/2013 | 8/14/2013 | 99214 | 99212 | $240 | $81.40 | $55.32 | Medicare/J.K. |
| 4 | RAKESH SHARMA | 10/25/13 | 11/2/2013 | 99214 | 99212 | $240 | $81.40 | $55.32 | Medicare/F.E. |

**In violation of Title 18, United States Code, Sections 1347 and 2.**

## FORFEITURE ALLEGATION

Upon conviction of any of the offenses set forth in Counts 1 through 4 of this Indictment, the defendants, **RAKESH SHARMA** and **MIKE JONES**, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense(s).

## SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C.

§ 982(b)(1), to seek forfeiture of any other property of the defendants, up to the value of the property described above.

A TRUE BILL,

/S/

---

GRAND JURY FOREPERSON

BENJAMIN C. GLASSMAN
UNITED STATES ATTORNEY

MARITSA A. FLAHERTY
SPECIAL ASSISTANT UNITED STATES ATTORNEY